UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| BFI WASTE SYSTEMS OF NORTH AMERICA LLC, | Case No. 10-CV-4358 (PJS/TNL) |
| Plaintiff/Counterclaim Defendant, | MEMORANDUM OPINION AND ORDER |
| v. | |
| FREEWAY TRANSFER, INC., | |
| Defendant/Counterclaimant. | |

Daniel Q. Poretti, Katie M. Connolly, and Benjamin C. Johnson, NILAN JOHNSON LEWIS PA, for BFI Waste Systems of North America LLC.

Scott G. Harris and Timothy M. Kelley, LEONARD STREET AND DEINARD, PA, for Freeway Transfer, Inc.

This case involves a contract dispute between two waste-management companies: BFI Waste Systems of North America LLC ("BFI") and Freeway Transfer, Inc. ("Freeway"). This matter is before the Court on Freeway's motion for partial summary judgment [Docket No. 39], BFI's motion for summary judgment [Docket No. 45], and Freeway's motion for sanctions pursuant to Fed. R. Civ. P. 11 [Docket No. 65]. For the reasons that follow, the Court denies both parties' summary-judgment motions and Freeway's motion for sanctions.

I. BACKGROUND

The following is undisputed:

In 1990, Hennepin Transfer Inc., an affiliate of BFI, contracted with Freeway to use Freeway's waste-transfer station in Burnsville, Minnesota ("Freeway Transfer Station").[1]

---

[1]Waste-transfer stations collect waste from smaller waste-collection vehicles (e.g., dump trucks or pickup trucks). The waste is then loaded onto large, semi-trailer trucks for

(continued...)

Sometime in 2003, BFI began constructing its own waste-transfer station in Eden Prairie, Minnesota ("Eden Prairie Transfer Station").  Freeway claimed that BFI had breached a provision of the parties' 1990 contract by constructing a competing transfer station near the Freeway Transfer Station.  On November 13, 2003, Michael McGowan, President of Freeway, and Paul Rosland, BFI's District Manager, executed a two-page letter agreement to settle Freeway's claim against BFI.  This two-page agreement ("2003 Contract"), which consists of just seven numbered paragraphs, is the focus of this litigation.

For purposes of the parties' summary-judgment motions, only two paragraphs of the 2003 Contract are at issue.  Paragraph 2 sets forth BFI's payment obligations to Freeway, providing, in relevant part, as follows:

> BFI agrees beginning in January of 2009,[2] to pay Freeway a guaranteed $230,000 per year.  This amount will be paid in equal monthly installments.  In return for this guaranteed payment of $230,000, BFI shall have the ability to use Freeway's Transfer station . . . for up to 250 tons per day. . . .
>
> In addition to the annual guaranteed amount of $230,000, BFI agrees to pay all operating expenses, including the taxes up to $60,000 per year, at the Freeway Transfer Station.  This agreement is for a ten-year term. . . .
>
> If another hauler or entity (including governmental entities) uses the facility, all expenses and repairs including taxes will be shared on a pro rate basis by tonnage.

McGowan Aff. Ex. C at ¶ 2 [Docket No. 42-3] (line breaks added for clarity).

---

[1](...continued)
transportation to landfills.

[2]The parties later amended Paragraph 2 to delay commencement of BFI's monthly payment obligations until March 2010.  McGowan Aff. Ex. D [Docket No. 42-4].

Paragraph 4 provides that, upon the occurrence of any of four conditions, BFI's obligation to pay Freeway will be void:

> Freeway and BFI agree that provisions 2 and 3 of this letter agreement will be null and void [1] in the event of the imposition of flow control or other regulatory changes which make the operation of the Freeway Transfer Station economically not viable; [2] if a tax is imposed which also makes the operation of the Freeway Transfer Station as outlined above financially not viable, or [3] BFI's landfill located in or about Sarona, Wisconsin ("Lake Area Disposal") closes for any reason,[3] or [4] its ability to accept municipal solid waste is significantly reduced by virtue of changes to existing regulations, laws or taxes.

> BFI agrees that it will not declare the operation of the Freeway Transfer Station economically "unviable" unless it has also ceased municipal solid waste transfer operations at any other BFI transfer station facility located within 30 miles of the Freeway Transfer Station including the Eden Prairie BFI transfer facility currently under construction. . . .

McGowan Aff. Ex. C at ¶ 4 (line break and bracketed numbers added for clarity). The Court will refer to each of the four conditions that void BFI's payment obligations as a "cancellation clause."

In 2009, Wisconsin significantly increased the tax that it imposes on the deposit of waste in landfills within the state — apparently in an attempt to reduce the amount of out-of-state waste brought to Wisconsin for disposal. *See* Wis. Stat. §§ 289.645 and 289.67. The tax was imposed on generators and haulers of waste, but landfill owners were required to collect it. After the tax increase took effect, BFI and other waste haulers stopped bringing Minnesota waste to

---

[3]The parties use the terms "Lake Area Disposal" and "Sarona landfill" interchangeably. For clarity, the Court will refer to the Lake Area Disposal as the Sarona landfill.

the Sarona landfill.  This had a substantial impact on the landfill, as most of the waste deposited

in Sarona had come from Minnesota.[4]

In January 2010, Bryan Zimmerman, BFI's Area President, emailed McGowan to inform

him that BFI would not be using the Freeway Transfer Station beginning in March 2010, as

originally planned.  Johnson Aff. Ex. M. [Docket No. 49-2]; *see also* Zimmerman Dep. Ex. 12.[5]

Zimmerman reassured McGowan, however, that BFI would continue to "honor [its] contractual

agreement" with Freeway.  *See* Zimmerman Dep. Ex. 12.  And, true to its word, BFI paid

Freeway over $90,000 from March 2010 to August 2010, as required by Paragraph 2 of the 2003

Contract.  *See* Zimmerman Dep. at 199; *see also* Zimmerman Dep. Ex. 17.

On September 1, 2010, however, BFI notified Freeway that, pursuant to the fourth

cancellation clause of Paragraph 4, it was declaring its payment obligations null and void

because of the Wisconsin tax increase.  *See* Zimmerman Dep. Ex. 3; Johnson Aff. Ex. O at

BFI000207 [Docket No. 49-2].  BFI stopped making payments to Freeway, and this lawsuit

ensued.

## II.  DISCUSSION

The parties' motions for summary judgment raise four questions:

First, did the Wisconsin tax increase significantly reduce the Sarona landfill's "ability to

accept municipal solid waste," thereby voiding BFI's payment obligations?

---

[4]According to BFI, the Sarona landfill received 70% less waste in December 2009 (after
the tax increase took effect) than it did in December 2008.  *See* Johnson Aff. Ex. O at BFI000207
[Docket No. 49-2].

[5]At the Court's request, the parties submitted full transcripts (including exhibits) for each
of the witnesses who were deposed.  The Court will cite to these deposition transcripts and
exhibits without referring to the docket entry on CM/ECF.

Second, if the tax increase did significantly reduce the Sarona landfill's ability to accept waste, did BFI knowingly and intentionally waive its right to void its payment obligations on that basis?

Third, is BFI required to close its Eden Prairie Transfer Station if it voids its payment obligations for any reason?

Fourth, if the tax increase did not void BFI's payment obligations, is BFI's prorated share of the Freeway Transfer Station's operational expenses (including taxes) calculated by its actual use of the facility, or is it calculated as if BFI uses 250 tons of capacity per day (even if it uses less)?

The Court will address these questions in turn.

## A.  Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor."  *Id.* at 255.

## B.  Ability to Accept Waste

The fourth cancellation clause of Paragraph 4 relieves BFI of its obligation to pay Freeway if the Sarona landfill's "ability to accept municipal solid waste is significantly reduced by virtue of changes to existing regulations, laws or taxes."  McGowan Aff. Ex. C at ¶ 4.  BFI

argues that the Wisconsin tax increase — which was imposed on waste generators and haulers — made it too expensive for BFI and other haulers to bring Minnesota-generated waste to the Sarona landfill.  And because haulers stopped bringing Minnesota-generated waste to the Sarona landfill, says BFI, the landfill's ability to accept waste was significantly reduced.

To describe BFI's argument is almost to refute it.  Obviously, the fact that demand for a landfill decreases does not mean that the landfills' ability to accept waste is reduced (at least directly).  There is a big difference between how much waste a landfill is *able* to accept and how much waste is *brought* to the landfill.  If today haulers bring 1000 tons of waste to Sarona, and tomorrow haulers bring 800 tons of waste, and the following day haulers bring 1200 tons of waste, that does not mean that the amount of waste that Sarona is "ab[le] to accept" is 1000 tons today, 800 tons tomorrow, and 1200 tons the following day.  Clearly, the Wisconsin tax increase did not *directly* reduce the Sarona landfill's "ability to accept municipal solid waste."

The tax increase may have done so *indirectly*, however.  If a tax increase so substantially reduces the demand for a landfill that, in response, the landfill sells off land or heavy equipment or lays off staff, then the *indirect* result of the tax increase could be a significantly reduced ability of the landfill to accept waste.  Whether any sale of land, or sale of equipment, or reduction of staff actually reduces a landfill's ability to accept waste is, of course, a question of fact.

In this case, it is undisputed that, in the wake of the Wisconsin tax increase, waste haulers stopped bringing Minnesota-generated waste to the Sarona landfill.  It is also undisputed that, as a result, the demand for the Sarona landfill was significantly reduced.  Finally, it is undisputed that, because of that significantly lower demand, some of the landfill's employees were laid off

-6-

and one of the landfill's two "tippers"[6] was moved to a landfill in Pine Bend, Minnesota.  *See* Zimmerman Dep. at 60, 75-76; *see also* Zimmerman Dep. Ex. 9 at BFI014014 (discussing the cost of relocating the tipper to Pine Bend).  Thus, it is entirely possible that, as a result of the Wisconsin tax increase, the Sarona landfill's "ability to accept municipal solid waste [has been] significantly reduced."

Freeway disagrees.  It contends that such an indirect reduction in the Sarona landfill's ability to accept waste would fall outside the scope of the fourth cancellation clause.  Freeway points out that BFI owns the Sarona landfill, and thus it was BFI's choice to lay off the landfill's employees and move one of the landfill's tippers to another site.  Freeway insists that the parties never intended to grant BFI the power to evade its payment obligations by unilaterally manipulating the Sarona landfill's staffing and equipment levels in response to a tax that is imposed on waste haulers.  Rather, Freeway argues, a tax increase would have to be imposed directly on landfills to trigger the fourth cancellation clause.

The Court disagrees.  The fourth cancellation clause was drafted very broadly and in the passive voice, relieving BFI of its payment obligations if the Sarona landfill's ability to accept waste "is significantly reduced *by virtue of* changes to existing regulations, laws or taxes." McGowan Aff. Ex. C at ¶ 4 (emphasis added).  "By virtue of" means simply "by reason of" or "because of."  If, before a tax increase, a landfill with 1000 acres, four gates, four tippers, and 40 employees could accept 40,000 tons of waste per day — and if, in response to the reduction in demand caused by a tax increase, the landfill sells 750 acres, closes three gates, sells three

---

[6]At the hearing, BFI informed the Court that a "tipper" is a large and expensive piece of machinery that is used to unload (or "tip") waste from semi-trailer trucks into the landfill.

tippers, and lays off 30 employees, reducing its ability to accept waste to 10,000 tons per day —
then a jury could find that the landfill's ability to accept waste had been significantly reduced
"by virtue of" the tax increase.

There is a second problem with Freeway's argument:  It is difficult to imagine any kind
of tax increase that would *directly* reduce a landfill's ability to accept waste.  Clearly, the fourth
cancellation clause envisions that "taxes" can cause a significant reduction in the Sarona
landfill's ability to accept waste.   And Freeway concedes that an increase in a tax imposed *on*
*landfills* — e.g., a $100 tax imposed on landfills for every ton of waste accepted over 500 tons
per day — could trigger the cancellation clause.  *See* Freeway Mem. Opposing BFI's Mot. for
S.J. at 9 ("Freeway Opp. Mem.") [Docket No. 59].  But, even in that scenario, the tax increase
would not directly reduce the landfill's ability to accept waste.  A landfill would still have to
make the "unilateral" decision not to accept more than 500 tons of waste per day, rather than,
say, accept waste at a loss or pass on all or part of the tax increase to haulers.

 Drawing all reasonable inferences in favor of BFI (as the Court must in ruling on
Freeway's summary-judgment motion), the Court holds that a jury could find that the Sarona
landfill's "ability to accept municipal solid waste" was "significantly reduced by virtue of" the
Wisconsin tax increase.[7]  And drawing all reasonable inferences in favor of Freeway (as the

---

[7]Freeway cites the deposition testimony of Zimmerman and James Nelson, BFI's Area
Controller, as evidence that the Sarona landfill had the same "staffing and capacity" to accept
waste after the tax increase took effect as it did before.  *See* Nelson Dep. at 47; *see also*
Zimmerman Dep. at 73.  It is unclear from the record when exactly BFI laid off the landfill's
employees and moved the tipper to Pine Bend.  It is also unclear whether Zimmerman and
Nelson were testifying about the landfill's "staffing and capacity" before staff layoffs and the
tipper relocation, or afterwards.  Drawing all reasonable inferences in favor of BFI, even if the
Sarona landfill had the same staffing and capacity to accept waste immediately after the tax

(continued...)

Court must in ruling on BFI's summary-judgment motion), the Court holds that a jury could find

that the Sarona landfill's "ability to accept municipal solid waste" was not "*significantly* reduced

by virtue of" the Wisconsin tax increase — because, for example, BFI could easily rehire its

laid-off employees or easily move its tipper back to Sarona.  The question of whether the fourth

cancellation clause was triggered — voiding BFI's obligation to make payments to Freeway —

must be tried to a jury.

### C.  Waiver

Freeway argues that, even if the Wisconsin tax increase gave BFI the right to void its

payment obligations, BFI intentionally waived that right.[8]  According to Freeway, BFI knew

about the tax increase and the magnitude of its impact on the Sarona landfill by the end of 2009.

*See* Zimmerman Dep. at 78-79, 154-55.  Yet in January 2010, Zimmerman of BFI informed

McGowan of Freeway that BFI would "honor [its] contractual agreement" — and, beginning in

March, BFI made a series of payments due under the contract.  *See* Zimmerman Dep.

---

[7](...continued)
increase took effect, a jury could nonetheless find that, some time later, the landfill's ability to
accept waste was significantly reduced because of staff cuts and the loss of heavy equipment.

[8]At the hearing, the Court pointed out that Paragraph 4 of the 2003 Contract — which
contains the four cancellation clauses — provides that, if any of the clauses is triggered, the
payment obligations found in Paragraphs 2 and 3 of the contract "will *be* null and void."
McGowan Aff. Ex. C at ¶ 4 (emphasis added).  This suggests that the payment obligations are
*void* not *voidable* — i.e., that the triggering of a cancellation clause itself voids the payment
obligations, and does not merely give BFI the right to declare the payment obligations void.

But both parties construe Paragraph 4 to mean that, if a cancellation clause is triggered,
BFI has the right to void its payment obligations — and that, if BFI does not exercise its right,
the payment obligations continue.  *See* Freeway Mem. Supporting Freeway's Mot. for Part. S.J.
at 26 ("Freeway Mem.") [Docket No. 40]; BFI Mem. Opposing Freeway's Mot. for Part. S.J. at
3-4 ("BFI Opp. Mem.") [Docket No. 56].  Because both parties to the contract agree that this is
what the contract means, the Court will enforce the contract as interpreted by the parties.

Exs. 12, 17.  Freeway contends that, when BFI sent the email and made the payments, BFI

waived its right under the fourth cancellation clause to void its payment obligations on the basis

of the Wisconsin tax increase.

"Waiver is the intentional relinquishment of a known right."  *Frandsen v. Ford Motor

Co.*, 801 N.W.2d 177, 182 (Minn. 2011).  The party asserting waiver has the burden to establish

that the waiving party both knew of the right and intended to waive it.  *Id.*  Although a party's

intent to waive a right may be inferred from its conduct, the Minnesota Supreme Court has

emphasized that "[w]aiver generally is a question of fact, and it is rarely to be inferred as a

matter of law."  *Valspar Refinish, Inc. v. Gaylord's Inc.*, 764 N.W.2d 359, 367 (Minn. 2009)

(internal quotations omitted).

In this case, the Court cannot hold, as a matter of law, that BFI waived its right to void its

payment obligations.  To begin with, BFI had no *reason* to waive its right.  In cases in which

waiver through conduct is found, the waiving party generally has an incentive to relinquish a

contractual right.  For example, if a party is making a lot of money under a contract, it is easy to

perceive that party's continued performance of the contract after the party had the right to void

the contract as strong evidence that the party intended to waive its right.  *See, e.g.*, *Appollo v.

Reynolds*, 364 N.W.2d 422, 424 (Minn. Ct. App. 1985) (sellers' intent to waive rescission rights

under the purchase agreements may be inferred as a matter of law by their insistence that buyers

continue to perform); *Labalo v. N. Country, Inc.*, No. C4-97-9, 1997 WL 396219, at *5 (Minn.

Ct. App. July 15, 1997) (a landlord's intent to forgo his right to receive written notice of a lease

renewal may be inferred as a matter of law from his acceptance of rent checks from the tenant for

over five years).  In this case, it is difficult to think of any reason why BFI would have

intentionally relinquished a right to void an obligation to pay over $2 million for space at the Freeway Transfer Station that it did not need and was not using.

Freeway's waiver argument suffers for another reason. Often, the condition that gives rise to a right to void a contract is clear — such as the missing of an important deadline or the failure of the discount rate set by the Federal Reserve to rise above a certain level. In such cases, it is easy to infer that a party must have known of its right to void the contract, and easy to find that the party must have intended to waive that right when it continued to perform. In this case, for example, had BFI closed its Sarona landfill altogether — an act that would have unquestionably given BFI the right to void its payment obligations — Zimmerman's email and BFI's making $90,000 in contractual payments would have created a strong inference that BFI intended to forgo its right to void its payment obligations.

In fact, though, what allegedly gave rise to BFI's right to void its payment obligations was not the closing of the Sarona landfill or some similarly indisputable event, but rather a tax increase that may or may not have "significantly reduced" the Sarona landfill's "ability to accept municipal solid waste." As the past 18 months of litigation have demonstrated, this is far from an indisputable event, and the fact that BFI did not immediately declare its payment obligations void does not give rise to a strong inference that it intentionally waived a known right.[9]

_____

[9]Courts also find waiver as a matter of law in cases where the waiving party sits on a contractual right for a very long time. *See, e.g.*, *Cut Price Super Markets v. Kingpin Foods, Inc.*, 98 N.W.2d 257, 266-67 (Minn. 1959) (5-year delay); *Murphy Oil USA, Inc. v. Brooks Hauser*, 820 F. Supp. 437, 442 (D. Minn. 1993) (20-month delay); *Labalo*, 1997 WL 396219, at *5 (5-year delay). Under the circumstances of this case, BFI's performance of the contract for six months does not constitute such a long delay as to establish waiver as a matter of law.

For these reasons, the Court holds that a reasonable jury *could* find — but would not *have* to find — that BFI waived its right to void its payment obligations when Zimmerman sent his email in January 2010 and when BFI made $90,000 in payments in 2010.  The issue of waiver will have to be tried.  *See Farnum v. Peterson-Biddick Co.*, 234 N.W. 646, 647 (Minn. 1931) (to find waiver as a matter of law, the conduct suggesting waiver must "be so inconsistent with a purpose to stand upon one's rights as to leave no room for a reasonable inference to the contrary").

### D.  Eden Prairie Transfer Station

As described above, Paragraph 4 of the contract gives BFI the right to void its payment obligations if one of four events occurs: (1) if regulatory changes make "the operation of the Freeway Transfer Station economically not viable"; (2) if a tax makes "the operation of the Freeway Transfer Station . . . financially not viable"[10]; (3) if the Sarona landfill "closes for any reason"; or (4) if the Sarona landfill's ability to accept waste is "significantly reduced by virtue of changes to existing regulations, laws or taxes."  McGowan Aff. Ex. C. at ¶ 4.  There is a clear distinction between the first and second cancellation clauses, on the one hand, and the third and fourth cancellation clauses, on the other hand.  The first and second clauses relate to the Freeway Transfer Station (and, in particular, to its economic viability), while the third and fourth clauses relate to the Sarona landfill.

---

[10]The parties appear to agree that there are no material differences between the terms "economically not viable" and "financially not viable."  *See* BFI Mem. Supporting BFI's Mot. for S.J. at 15 [Docket No. 47]; Freeway Opp. Mem. at 10-11.

Freeway argues that BFI is required to close its Eden Prairie Transfer Station if it invokes *any* of the four cancellation clauses.  Such an interpretation cannot be reconciled with the plain language of Paragraph 4, which provides in relevant part:

> BFI agrees that it will not declare *the operation of the Freeway Transfer Station economically "unviable"* unless it has also ceased municipal solid waste transfer operations at any other BFI transfer station facility located within 30 miles of the Freeway Transfer Station including the Eden Prairie BFI transfer facility currently under construction. . . .  In the event that BFI re-opens, builds, manages or operates any transfer station within a 30-mile radius of the Freeway Transfer Station after declaring *the operations of the Freeway Transfer Station economically unviable*, BFI agrees to continue or resume operations at the Freeway Transfer Station . . . .

McGowan Aff. Ex. C at ¶ 4 (emphasis added).  As this language makes crystal clear, BFI is only required to close its Eden Prairie Transfer Station if it declares the operation of the Freeway Transfer Station to be economically unviable — that is, if it invokes the first or second cancellation clause.  Any doubt that closure of BFI's Eden Prairie Transfer Station is tied only to the economic viability of the Freeway Transfer Station is erased by the last sentence of Paragraph 4, which requires BFI to resume operations at the Freeway Transfer Station if BFI reopens its Eden Prairie Transfer Station "after declaring the Freeway Transfer Station economically unviable."  McGowan Aff. Ex. C. at ¶ 4.

Freeway does not really disagree that this is what the 2003 Contract says.  But Freeway argues that what the contract *says* is not what the parties *agreed*.  Specifically, Freeway argues that both parties intended to require BFI to close its Eden Prairie Transfer Station if it invoked *any* of the four cancellation clauses; that the 2003 Contract failed to say this because of a mutual mistake; and that the Court should therefore reform the contract.

The doctrine of reformation permits a court to rewrite a contract so that it accurately reflects the parties' true agreement at the time of contracting. This is a very narrow doctrine that is often invoked but rarely successful. To prevail, the party seeking reformation must prove by "clear and consistent, unequivocal and convincing" evidence that: "'(1) there was a valid agreement between the parties expressing their real intentions; (2) the written instrument failed to express the real intentions of the parties; and (3) this failure was due to a mutual mistake of the parties . . . .'" *SCI Minn. Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp.*, 795 N.W.2d 855, 865 (Minn. 2011) (quoting *Nichols v. Shelard Nat'l Bank*, 294 N.W.2d 730, 734 (Minn. 1980)).

This is one of the rare cases in which mutual mistake might be found. The 2003 Contract was negotiated by two individuals and two individuals only: McGowan (on behalf of Freeway) and Rosland (on behalf of BFI). Both McGowan and Rosland have given sworn testimony that, notwithstanding what they wrote in the contract, they in fact agreed that BFI would have to close its Eden Prairie Transfer Station if it invoked *any* of the four cancellation clauses. *See* McGowan Dep. at 77-79; Rosland Dep. at 91-92, 128-29. The failure of Paragraph 4 to clearly state that intention, McGowan and Rosland say, was the result of mutual mistake.

Based on McGowan's and Rosland's testimony, the Court cannot grant summary judgment to BFI on Freeway's reformation claim. But the Court also cannot grant summary judgment to Freeway. For a couple of reasons, the Court cannot find, as a matter of law, that Freeway has established mutual mistake by clear and convincing evidence:

First, the only evidence that Freeway submits in support of its claim of mutual mistake is the testimony of McGowan and Rosland about what they intended almost ten years ago.[11]  But neither McGowan nor Rosland is a disinterested witness.  McGowan, obviously, is not disinterested, as he is the President of Freeway.  Rosland's neutrality is also in question given that he appears to have been fired by BFI in 2006, BFI Opp. Mem. at 18 n. 2, and he now owns a waste-collection company that competes with BFI, Rosland Dep. at 7-8, 23.

Second, McGowan's and Rosland's testimony is simply not credible.  It is not hard to believe two individuals who sign a written contract calling for the sale of a home located at "11144 East Superior Street, Duluth, Minnesota" when they later testify that they actually agreed on the sale of a home located at "1144 East Superior Street, Duluth, Minnesota."  But it is very hard to believe two individuals who sign a written contract calling for the sale of a home located at "11144 East Superior Street, Duluth, Minnesota" when they later testify that they actually agreed on the sale of "Madison Square Garden, New York, New York."

As noted, Paragraph 4 of the BFI-Freeway contract describes four events that allow BFI to void its payment obligations.  Two of those events relate to the economic viability of the

---

[11]Freeway relies heavily on *Metro Office Parks Co. v. Control Data Corp.*, where the Minnesota Supreme Court affirmed the trial court's substantive reformation of the parties' lease agreement on the basis of mutual mistake.  205 N.W.2d 121, 124 (Minn. 1973).  The Court agrees with Freeway that the doctrine of reformation is not limited to correcting clerical errors and technical mistakes.  But *Metro Office Parks* is inapposite.  In that case, the plaintiff's claim of mutual mistake was supported by the parties' near-contemporaneous letter of intent and the defendant's intra-office correspondence.  *Id.* at 125-26.  In light of documentary evidence that established the parties' true intentions at the time of contracting, the Minnesota Supreme Court held that "the trial court could find, as it did, that the variation in language [in the final contract] was the result of inadvertence or lack of understanding by the scrivener in the choice of language . . . ."  *Id.* at 126.  Here, by contrast, there is no similar contemporaneous documentary evidence to corroborate McGowan's and Rosland's testimony.

-15-

Freeway Transfer Station, and two of those events relate to the Sarona landfill.  Paragraph 4 then goes on to tie the closing of the Eden Prairie Transfer Station to the economic viability of the Freeway Transfer Station — and Paragraph 4 does this not once, but twice.  Paragraph 4 does not so much as hint that the closing of the Eden Prairie Transfer Station has any connection to the Sarona landfill, which only makes sense:  After all, the Freeway Transfer Station and the Eden Prairie Transfer Station are both *transfer stations* and are about 10 miles apart, while the Sarona landfill is a *landfill* that is about 150 miles from the Eden Prairie Transfer Station.  It is logical to tie the closing of the Eden Prairie Transfer Station to a declaration by BFI that its use of the nearby Freeway Transfer Station is not economically viable; it is considerably less logical to tie the closing of the Eden Prairie Transfer Station to events affecting a landfill that is almost 150 miles away.

In short, it is difficult to believe McGowan and Rosland when they allege that they agreed to tie the closure of the Eden Prairie Transfer Station not just to a declaration regarding the economic viability of the Freeway Transfer Station, but also to events at the Sarona landfill, and that the contract does not say this because they both made a "mistake."  It is also difficult to believe that neither of these sophisticated businessmen negotiating a multimillion dollar contract happened to notice this "mistake," despite the fact that it appears twice in a two-page contract, and despite the fact that they exchanged drafts of the contract on several occasions (*see* Rosland Dep. Exs. 4-7, 10-11).

To be clear:  The mere possibility that a witness's trial testimony will not be believed is never a sufficient reason to deny a summary-judgment motion premised on that testimony.  In this case, however, BFI points to specific evidence in the record that establishes much more than

a mere possibility that the testimony of McGowan and Rosland will not be believed.  Moreover,

Freeway has to prove mutual mistake by clear and convincing evidence; in light of the obvious

problems with McGowan's and Rosland's testimony, the Court cannot find that Freeway has

done so as a matter of law.

For these reasons, the Court denies summary judgment to both BFI and Freeway on

Freeway's reformation claim.[12]  The claim will have to be tried.

### E.  BFI's Share of Operating Expenses

For the reasons described above, the parties will have to try the question of whether BFI

is obligated to make payments to Freeway.  If BFI is found to be obligated to make those

payments, then an additional question will arise:  How is BFI's share of the Freeway Transfer

Station's operating expenses and taxes to be calculated under Paragraph 2 of the 2003 Contract?

This much is undisputed:  Paragraph 2 requires BFI to pay Freeway $230,000 per year

for the right to dispose of up to 250 tons of waste per day at the Freeway Transfer Station.  This

is what the parties characterize as a "put-or-pay" agreement — reflecting the fact that BFI must

pay the full $230,000 even if it does not use the Freeway Transfer Station at all.  *See* Freeway

------

[12]The Court rejects BFI's argument that any mistake was not mutual but unilateral because McGowan drafted the provision.  In every mutual-mistake case, *someone* had to draft the provision in question; therefore, under BFI's logic, the doctrine of reformation due to mutual mistake would never apply.  The words "unilateral" and "mutual" refer not to how many people were *drafting*, but to how many people were *mistaken*.  Regardless of who drafted Paragraph 4 of the BFI-Freeway contract, both McGowan and Rosland testified that they reached a particular agreement regarding the closing of the Eden Prairie Transfer Station, and both of them testified that they mistakenly believed that Paragraph 4 accurately reflected their agreement.  *See generally Kleis v. Johnson*, 354 N.W.2d 609, 613 (Minn. Ct. App. 1984) ("In order to have mutual mistake, it is necessary that both parties agree as to the content of the document, but that somehow, through the drafter's error or otherwise, the document does not reflect that agreement.").

Mem. at 33-34; BFI Reply Mem. Supporting BFI's Mot. for S.J. at 12 ("BFI Reply Mem.")

[Docket No. 62].   Paragraph 2 also requires BFI to pay "all operating expenses" of the Freeway

Transfer Station, including up to $60,000 per year of taxes.   But this commitment is qualified in

an important way:   "If another hauler or entity . . . uses the facility, all expenses and repairs

including taxes will be shared on a pro rate basis by tonnage."   McGowan Aff. Ex. C. at ¶ 2.

    The parties dispute the meaning of the qualifier.   According to Freeway, BFI's agreement

to pay expenses and taxes is a put-or-pay agreement similar to BFI's agreement to pay $230,000

per year.   Thus, Freeway says, BFI's prorated share of expenses and taxes must be calculated as

if BFI uses 250 tons of capacity per day — even if BFI does not use the Freeway Transfer

Station at all.   BFI disagrees.   According to BFI, its agreement to pay expenses and taxes is

entirely separate from its put-or-pay agreement to pay $230,000 per year, and therefore its

prorated share of expenses and taxes must be calculated based on its *actual* use of the Freeway

Transfer Station.   Because other haulers have used the facility, and BFI has not used the facility

at all, BFI insists that its share of the expenses and taxes of the Freeway Transfer Station is zero.

    This is a tough issue.   Freeway is correct that the operative language simply says "pro

rate basis by tonnage," and not "pro rate basis by tonnage *used*."   Moreover, Freeway's assertion

that the put-or-pay agreement applies to the expense-sharing provision finds support in the text

of the contract.   The penultimate sentence of Paragraph 2 — that is, the sentence immediately

preceding the expense-sharing provision — provides that "[i]f someone other than BFI is

interested in the additional capacity of the Freeway Transfer Station, BFI shall have the ability to

match the offer to Freeway."   McGowan Aff. Ex. C at ¶ 2.   This sentence makes clear that, if

another hauler does use the Freeway Transfer Station (thereby triggering the expense-sharing

provision), that hauler's use is limited to the facility's *additional* capacity — that is, to the capacity that is left after reserving 250 tons for BFI.  Given that Freeway is contractually obligated to reserve 250 tons of capacity per day for BFI's use, it is not unreasonable to assume that the parties intended for BFI's prorated share of the expenses and taxes to be at least 250 tons.

The Court also agrees with Freeway that BFI's interpretation of the expense-sharing provision could produce some odd results.  Suppose, for example, that no one (including BFI) uses the Freeway Transfer Station.  In such a scenario, the parties agree that BFI would be responsible for *all* of the facility's expenses and taxes (although BFI's responsibility for taxes would be capped at $60,000 per year).  It would be odd, then, that the moment that another hauler drops off so much as a gum wrapper at the Freeway Transfer Station, BFI would have *zero* obligation to pay expenses and taxes, and the other hauler (or Freeway) would have to pay *all* of those expenses and taxes.  That would be a very expensive gum wrapper.

That said, Freeway's interpretation of the expense-sharing provision is not entirely satisfactory either.  Freeway says that, pursuant to Paragraph 2, BFI agreed to pay $230,000 per year *plus* all of the Freeway Transfer Station's operating expenses in exchange for the ability to use up to 250 tons of capacity per day.  *See* Freeway Opp. Mem. at 16.  But that is not what Paragraph 2 says.  Paragraph 2 provides that "[i]n return for *this guaranteed payment of $230,000*, BFI shall have the ability to use Freeway's Transfer station . . . for up to 250 tons per day."  McGowan Aff. Ex. C at ¶ 2 (emphasis added).  This sentence makes no reference to BFI's obligation to pay operating expenses.  It is true that Paragraph 2 then goes on to say that "[i]n addition to the annual guaranteed amount of $230,000, BFI agrees to pay all operating expenses

. . . at the Freeway Transfer Station."  McGowan Aff. Ex. C. at ¶ 2.  But this sentence makes no reference to the parties' put-or-pay agreement.  In other words, Paragraph 2 itself distinguishes between the "guaranteed" payment of $230,000 and the conditional payment of expenses and taxes — and thus it is not unreasonable to assume that the parties intended the "put-or-pay" aspect of their agreement to extend only to the former, and not to the latter.

The Court also agrees with BFI that Freeway's interpretation of the expense-sharing provision could produce some odd results itself.  Suppose, for example, that the Freeway Transfer Station is used only by one small-time hauler, who disposes of two tons of waste per day.  Suppose further that while using the facility, the hauler negligently runs his dump truck into an expensive piece of equipment, causing $100,000 in damages.  If no one else uses the facility, according to Freeway, BFI would be responsible for 99% of the repair bill (not to mention 99% of the facility's taxes and monthly expenses), even though it is not using the facility at all.  That doesn't seem fair.

In short, the only thing clear about the expense-sharing provision is that it is not clear, and thus its meaning will have to be decided by the jury.  *See Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346-47 (Minn. 2003) (explaining that "the interpretation of an ambiguous contract is a question of fact for the jury").  Accordingly, the Court denies both parties' summary-judgment motions on this issue.

## F.  Freeway's Motion for Sanctions

Freeway moves for sanctions under Fed. R. Civ. P. 11 on the grounds that BFI knew that its litigation position lacked evidentiary support before it filed suit.  Freeway incorporates its

summary-judgment arguments by reference.  Given the Court's rulings on the merits of those

arguments, Freeway's motion for sanctions is denied.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS

HEREBY ORDERED THAT:

1.    Freeway Transfer, Inc.'s motion for partial summary judgment [Docket No. 39] is

DENIED.

2.    BFI Waste Systems of North America LLC's motion for summary judgment

[Docket No. 45] is DENIED.

3.    Freeway's motion for sanctions [Docket No. 65] is DENIED.


Dated:  April 2, 2012                          _s/Patrick J. Schiltz_____
                                               Patrick J. Schiltz
                                               United States District Judge